## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

WELDON MOORE

CIVIL ACTION

VERSUS

NO. 21-698-JWD-RLB

EXCEL CONTRACTORS, LLC, d/b/a
EXCEL USA

## RULING AND ORDER

This matter comes before the Court on the *Motion for Summary Judgment* (Doc. 26) by

Defendant Excel Contractors, LLC, ("Defendant" or "Excel"). Plaintiff Weldon Moore ("Plaintiff

or "Moore") opposes the motion, (Doc. 35), and Excel has filed a reply, (Doc. 44). Oral argument

is not necessary. The Court has carefully considered the law, the facts in the record, and the

arguments and submissions of the parties and is prepared to rule. For the following reasons, the

motion is granted in part and denied in part.

I.    RELEVANT BACKGROUND

Plaintiff Weldon Moore, known to others as "Mo," is an African American truck driver

residing in the Lake Charles area of Louisiana. (*Defendant['s] . . . Response to Plaintiff['s] Local

Rule 56(c) Statement of Issues of Material Fact by Defendant[] . . . ("DRSIMF")* ¶ 1, Doc. 44-2.)[1]

Moore worked as a truck driver for Ron Williams Construction ("Ron Williams") at the Louisiana

Pigment plant in Lake Charles from 2010 to 2014, before Ron Williams was acquired by Excel in

April 2016. (*Id.* ¶ 2.)

---

[1] When the *DRSIMF* is cited alone, then that fact has either been admitted in *Plaintiff['s] Local Rule 56(c) Statement of Issues of Material Fact* ("*SIMF*"), Doc. 35-1, or been qualified or denied in such a way as to have it be deemed admitted as not properly controverted. *See* M.D. La. Civ. R. 56(c), (f); *Guillory v. Carrington Mortg. Servs., LLC*, No. 22-192, 2024 WL 1020555, at *1 n.1 (M.D. La. Mar. 8, 2024) (deGravelles, J.) (applying this rule).

Louisiana Pigment is Excel's client. (*Id.* ¶ 3.) Excel had several divisions at the plant, including landfill operators, coke drivers (because they haul coke material), ore drivers, and neutralization drivers (because they haul the waste product to the landfill). (Reed Dep. 16–17, Doc. 35-4 at 7–8.)

In or around 2014, Jeff Addison, a supervisor for Ron Williams at the time, discharged Mr. Moore in response to a newly instituted safety requirement by one of Ron Williams' clients. (Moore Dep. 18–20, Doc. 35-3 at 9–11.) Moore did not recall having any issues with Addison at Ron Williams prior to his termination there. (*Id.* at 20, Doc. 35-3 at 11.)

Moore began working at Excel in or around October 2016, after a Louisiana Pigment supervisor asked Moore if he would be interested in returning to work at Louisiana Pigment. (*Id.* at 13–14, Doc. 35-3 at 4–5.) On hearing from other employees at the Louisiana Pigment site about Moore, Addison called Moore the next day and told him, "You're working for me." (*Id.*)

But relations between Moore and Addison would disintegrate. As will be explained below, Moore claims that Addison made a racially offensive joke to Moore and then began harassing Moore almost daily for a number of years. All of this culminated in Moore filing the instant suit against Excel alleging a racially hostile work environment and retaliation in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991. (Doc. 1 ¶ 1.)

Plaintiff subsequently amended his complaint to claim that, shortly after the instant lawsuit was served on Excel, Defendant ordered Plaintiff not to return to work until further notice. (Doc. 13 ¶ 117–121.) Plaintiff thus pleads that he suffered a retaliatory termination. (*Id.*)

Excel now moves for summary judgment. (Doc. 26.) Defendant seeks dismissal of all claims against them. (*Id.* ¶ 2–4.)

## II.    SUMMARY JUDGEMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden and must identify 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue* for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted).

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

III.   DISCUSSION

A.  Hostile Work Environment

1.  *Parties' Arguments*

Excel first argues that, even assuming that Plaintiff's supervisor Addison regularly called Plaintiff the disparaging names alleged—specifically, "Black ass," "Black bitch," and "Black motherfucker,"—and even assuming Addison made the offensive joke claimed—specifically, "if a Black man and a Mexican man fell off a high-rise building, who do you think would hit the ground first?" . . . "Who gives a f__k?"—such comments and the joke "are woefully inadequate" to demonstrate the objectively abusive environment required for a hostile work environment claim. (Doc. 26-2 at 6; Doc. 35 at 7.) Defendant maintains that the comments were made sporadically over ten years, are insufficiently severe as a matter of law, were not physically threatening, and did not interfere with Plaintiff's work performance. (Doc. 26-2 at 6.) Defendant cites a number of Fifth Circuit cases in support of this position. (*Id.* at 6–7.) Defendant also points out that Plaintiff reported Addison's comments four times, with the last being to Shaun Dunn, Excel's Vice President; Dunn scheduled a meeting, Addison resigned before the meeting took place, and no further discrimination occurred. (*Id.* at 8.)

Plaintiff responds that a reasonable jury could find that Excel created a hostile work environment. (Doc. 35 at 3.) After arguing that Defendant did not plead the *Faragher/Ellerth* defense, Plaintiff says that Defendant is liable under the negligence standard—that is, it knew or should have known of the harassment and failed to take prompt remedial measures. (*Id.* at 4.)

Turning to Defendant's main arguments, Plaintiff says that, under Fifth Circuit law, constant verbal harassment with "sporadic" forms of other derogatory comments are enough to survive summary judgment. (*Id.* at 5 (citing *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 399 (5th

4

Cir. 2007); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *overruled on other grounds, Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).) Here, Plaintiff maintains that the harassment "occurred 'almost daily' for years, was at times physically threatening, and culminated in both cutbacks to his hours and disciplinary writeups." (*Id.* at 6–7.) Additionally, Addison used the disparaging names in front of others, with the intent of humiliating him. (*Id.* at 7.) Plaintiff asserts: "Addison's harassment escalated as well, in the form of hanging up on Mr. Moore repeatedly, turning his back on Moore, accusing Moore of stealing time, and cutting Mr. Moore's hours, which in fact interfered with his work." (*Id.* at 8.) Ultimately, says Plaintiff, Excel "ignores the record and fails to engage the authorities it purports to rely on, which are entirely related to string citations" that are "inapposite." (*Id.* at 8–9.)

Plaintiff goes on to argue that Excel should be strictly liable to Plaintiff because his supervisor's harassment resulted in a tangible employment action, namely, his disciplinary write ups and his cutting Plaintiff's hours. (*Id.* at 10–11.) Excel does not address this form of liability, but, in any event, even if there were no tangible employment action, Plaintiff could still recover because Defendant did not plead the *Faragher/Ellerth* defense. (*Id.* at 11.)

Further, contends Plaintiff, Excel was negligent in not responding promptly and in not adequately remedying the harassment Moore complained of on numerous occasions. (*Id.* at 12–13.) Indeed, Excel took no action whatsoever, failing even to document one, much less investigate. (*Id.* at 13.) Plaintiff then summarizes his evidence demonstrating Excel's failures before and after Moore's four complaints to management. (*Id.* at 13–14.)

In reply, Excel distinguishes Plaintiff's cases, arguing that each involved more frequent or severe discrimination than in the instant case. (Doc. 44 at 1–2.) Excel asserts:

> Even assuming that these comments were made and that Plaintiff believed they were subjectively offensive, they are woefully

> inadequate to establish a hostile work environment as the totality of the circumstances fails to demonstrate an objectively abusive work environment: (1) he only challenged a handful of remarks made sporadically over the course of nearly ten years; (2) none of the comments he alleges occurred are severe as a matter of law; and (3) none of the comments are . . . physically threatening.

(*Id.* at 3.) Defendant argues that Plaintiff's affidavits are "inadmissible and irrelevant summary judgment evidence" based on hearsay and events to which Plaintiff had no knowledge and from which he suffered no effect. (*Id.*)

Additionally, Excel argues that it took prompt action to remedy the harassment; Plaintiff experienced no harassment for sixteen months following Dunn and Addison's resignation, and Plaintiff only complained three times in ten years before that. (*Id.* at 4.)

Finally, the alleged harassment did not affect a term or condition of employment; the write up did not result in the loss of pay or affect his ability to do his job, and the time records that Excel provides show that Plaintiff was given more opportunities than most Excel truck drivers. (*Id.* at 4–5.)

### 2. *Law and Analysis*

"The analysis of discrimination claims under Section 1981 is identical to the analysis of Title VII claims." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins*., 869 F.3d 381, 386 (5th Cir. 2017).

> To state a hostile work environment claim under Title VII, the plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action.

*WC&M Enters.*, 496 F.3d at 399. Here, the fourth and fifth requirements are at issue. The Court will take each of these in turn.

a. <u>Affected a Term or Condition of Employment</u>

i. <u>*Applicable Law*</u>

As Judge Dennis explained in *WC&M Enterprises:*

> The Supreme Court has emphasized that Title VII's prohibition "is not limited to 'economic' or 'tangible' discrimination." *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 64 [ ] (1986). Rather, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 [ ] (1993) (quoting *Meritor Savings Bank*, 477 U.S. at 65, 67 [ ]); *see also* [*Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005)].

> For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. *Harris,* 510 U.S. at 21–22 [ ]. Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive. *Id.* To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance. *Id.* at 23 [ ]. No single factor is determinative. *Id.* In short, a showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 524 n. 33 (5th Cir. 2001)[, *abrogated on other grounds by Burlington*, 548 U.S. 53]. As the Supreme Court stated, "even without regard to . . . tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." *Harris,* 510 U.S. at 22 [ ].

> Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment. *See Harvill,* 433 F.3d at 435–36; *El–Hakem v. BJY Inc.,* 415 F.3d 1068, 1073 (9th Cir. 2005) (" 'The required level of severity or seriousness varies inversely with the

pervasiveness or frequency of the conduct.' ") (quoting *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 872 (9th Cir. 2001)); *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040, 1047 (7th Cir. 2002) (stating that severity and pervasiveness are, "to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.") (citation omitted). Indeed, this court has found that a regular pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII. *See, e.g., Walker*[, 214 F.3d at 626] (holding that African–American employees who were subjected to a variety of racial slurs over three-year period raised fact issue as to whether slurs were sufficiently severe or pervasive to violate Title VII); *Farpella–Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996) (plaintiff presented sufficient evidence from which a jury could find severe or pervasive harassment where plaintiff was subjected to offensive, sex-based comments two to three times per week).

*WC&M Enters.*, 496 F.3d at 399–400.

It is true that the Fifth Circuit has cautioned that:

The mere utterance of an ethnic or racial epithet that engenders offensive feelings in an employee, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Rather, the plaintiff must establish that the harassment complained of was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment.

*James v. Lane*, No. 12-523, 2014 WL 4809272, at *7 (M.D. La. 2014) (citations omitted).

Moreover, the Fifth Circuit is replete with instances in which a few isolated comments were

insufficient to establish Title VII liability. *See, e.g.*, *Long v. Eastfield Coll.*, 88 F.3d 300, 309 (5th

Cir. 1996) (single offensive joke about condoms in plaintiff's presence was insufficient to prove

hostile work environment claim); *Mosley v. Marion Cnty., Miss.*, 111 F. App'x 726, 728 (5th Cir.

2004) (evidence of three instances of using racial slurs was insufficient to establish a genuine issue

of material fact for a hostile work environment claim).

But Plaintiff's authority demonstrates that this burden is hardly insurmountable. For example, in *Johnson v. Halstead*, the Fifth Circuit was faced with allegations in which the employee argued he was "repeatedly subjected to behavior that was hostile, intimidating, and[ ] bullying, and it was done publicly over a period of more than three years." *Johnson*, 916 F.3d at 417–18.

> More specifically, he endured "false accusations of wrong doing, name calling, campaigning to turn others against [him], encouraging [his] peers and direct reports not to work with [him], or for [him] thereby marginalizing and undermining his supervisory effectiveness." . . . [T]here were occasions when the tension between [the plaintiff] and [his supervisor] was "so intense that the potential for physical aggression and altercation appeared imminent." It concluded that "race was at the core of the differences" in this conflict. And [the Chief of Police] publicly admitted not only that harassment occurred, but also that it resulted from [the plaintiff's] "skin color."

*Id.* In finding that these allegations stated a claim for a hostile work environment, the Fifth Circuit explained:

> These allegations go well beyond "simple teasing, offhand comments, and isolated incidents." *Faragher*, 524 U.S. at 788 [ ] (cleaned up). They allege a lengthier period of harassment than other verbal abuse that we have found was pervasive enough to create a hostile work environment. *See* [*WC&M Enters.*, 496 F.3d at 400] (finding genuine issue of material fact as to existence of hostile work environment when plaintiff was "subjected to verbal harassment on a regular basis for a period of approximately one year"); *see also Walker*[, 214 F.3d at 626–27] (also finding a fact issue when African-American employees were subjected to a variety of racial slurs over three-year period), *abrogated on other grounds by Burlington*[, 548 U.S. 53]. Most of all, Johnson provides concrete examples of how the racial intimidation "interfere[d] with [his] work performance." *See Harris*, 510 U.S. at 23[ ]. The racial hostility led to officers' boycotting meetings with Johnson and ignoring his assignments; colleagues' refusing to assist with the grant program Johnson oversaw; and Johnson's being investigated for fraud. Johnson has alleged a plausible claim of hostile work environment, and one that is apparent from clearly established law. If those allegations are not plausible when they are corroborated by

investigators the employer hired, it is tough to imagine when they will ever be.

*Johnson*, 916 F.3d at 418.

Likewise, in *WC&M Enterprises*, which was cited with approval by *Johnson*, the Fifth Circuit reversed the district court and found that there were questions of fact as to whether a Muslim car salesman was subjected to a hostile work environment:

> Here, the district court held that even if Rafiq could prove that any harassment occurred, "he has not shown that it was so severe that it kept him from doing his job." In so holding, the district court applied an incorrect legal standard. Whether Rafiq lost sales as a result of the alleged harassment is certainly relevant to his hostile work environment claim; but it is not, by itself, dispositive. The district court erred in concluding otherwise.
>
> Applying the totality of the circumstances test, we conclude that the EEOC has presented sufficient evidence to create an issue of fact as to whether the harassment that Rafiq suffered was so severe or pervasive as to alter a condition of his employment. The evidence showed that Rafiq was subjected to verbal harassment on a regular basis for a period of approximately one year. During that time, Rafiq was constantly called "Taliban" and referred to as an "Arab" by [a co-worker] and [the finance manager], who also mocked his diet and prayer rituals. Moreover, Rafiq was sporadically subjected to additional incidents of harassment, such as his co-workers' comments on September 11, 2001, which suggested that he was somehow involved in the terrorist attacks against the United States; [his co-worker's] statement that Rafiq should "just go back where [he] came from;" and [his direct supervisor's] October 16, 2002 written warning, which stated that Rafiq was acting like a "Muslim extremist." Finally, [the finance manager] frequently banged on the glass partition of Rafiq's office, in order to startle him. As noted above, in the context of [the finance manager's] other actions toward Rafiq, a factfinder could reasonably conclude that this conduct was also motivated by animus stemming from Rafiq's religion and national origin.
>
> Although no single incident of harassment is likely sufficient to establish severe or pervasive harassment, when considered together and viewed in the light most favorable to the EEOC, the evidence shows a long-term pattern of ridicule sufficient to establish a claim under Title VII. *See, e.g., Walker,* 214 F.3d at 626; *Farpella–*

> *Crosby,* 97 F.3d at 806; *cf. Hussain v. Highgate Hotels, Inc.,* 126
> Fed. Appx. 256, 268–69 (6th Cir. 2005) (plaintiff who was called
> "Taliban" on a regular basis by co-workers raised issue of fact on
> hostile work environment claim under state civil rights statute).

*WC&M Enters.*, 496 F.3d at 400–01.

### ii.    *Analysis*

Having carefully considered the matter in light of the above authorities, the Court will deny Defendant's motion on this issue. In short, the Court finds that Plaintiff has easily demonstrated a question of fact precluding summary judgment on this claim.

First, as stated above, "to determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.* at 399–400. Again, "a regular pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII." *Id.* And "[t]he Supreme Court has emphasized that Title VII's prohibition is not limited to 'economic' or 'tangible' discrimination." *Id.* (cleaned up).

Here, the evidence shows that the harassment was frequent. Moore stated that, starting in 2016 or the early part of 2017, Addison told Moore the offensive racial joke and, "from that day forward, [Addison] just start[ed] treating [Moore] crazy." (Moore Dep. 87, Doc. 35-3 at 60.) Moore further attests that, when he "was working at Excel under the supervision of Jeff Addison, Addison called [Moore] and other Black drivers at the plant 'Black motherfucker' or 'Black ass' or 'Black bitch' *almost daily*." (Moore Decl. ¶ 5, Doc. 35-11 (emphasis added).) Moore continued, "Every time [he] was at work when Addison was there, [Addison] would use that language to refer to [Moore]." (*Id.*; *see also* Moore Dep. 87–89, Doc. 35-3 at 60–62 (testifying consistently with his

declaration).) Moore said this language continued even after his 2020 complaint to HR and management. (Moore Decl. ¶ 8, Doc. 35-11.)

Moore further testified that Addison repeated the offensive joke again in front of other employees at a later time," (Moore Dep. 111–12, Doc. 35-3 at 84–85), and then again a third time, (*Id.* at 114–15, Doc. 35-3 at 87–88.) After this third time, Moore reported the incident to HR because Moore was "tired of being called out and . . . felt like [he] was being racially discriminated against." (*Id.* at 115–16, Doc. 35-3 at 88–89.)

Moore's testimony is consistent with that of other former employees of Excel. Michael Grimm, a Caucasian truck driver, said that Addison would curse a lot and sound like an angry person, but Grim didn't "make much of it, until [he] noticed that [Addison] would single out the people of color on site with more demeaning language." (Grimm Decl. ¶ 1–2, 5, Doc. 35-14.) Grimm continued, "[h]e *regularly* referred to Johnny Taylor (foreman), Carl LNU (another truck driver), and Weldon Moore—all African American—as 'lazy,' 'dumb,' and 'stupid.' Although Jeff Addison would curse at all of us generally, calling us 'motherfuckers,' he specifically referred to the African American drivers as 'stupid motherfuckers.'" (*Id.* ¶ 6 (emphasis added).) Similarly, Aaliyah Landry, a former truck driver for Excel, also testified that she personally heard Addison call Moore a "Black motherfucker" soon after she started working there in the spring of 2020. (Landry Decl. ¶ 4, Doc. 35-17.) Likewise, David Tutson was an African-American security officer working for a firm which handles security operations for the Louisiana Pigment Plant. (Tutson Decl. ¶ 1–2, Doc. 35-13.) Tutson testified, "I recall at least a couple times when I heard Jeff Addison refer to Weldon Moore as 'Black motherfucker.'" (*Id.* ¶ 5.) Tutson also recalls Addison saying disparaging things about other African-Americans, calling another driver Karl Madderson "lazy motherfucker" and say of him, "I'm a fire that Black motherfucker yet." (*Id.* ¶ 6.) Tutson

said he would mostly use this disparaging language toward African Americans. (Tutson Dep. 48–49, Doc. 35-12 at 21–22.) Tutson said he never heard Addison refer to white employees or Hispanic employees as "lazy MFers" for the reason that all but one of his truck drivers are African-Americans. (*Id.* at 55–56, Doc. 35-12 at 28–29.)

All of this testimony strongly supports the conclusion that the use of disparaging racial language occurred frequently and that summary judgment is thus inappropriate. *See Johnson*, 916 F.3d at 418 (citing *WC&M Enters.* with approval for the proposition that being "subject to verbal harassment on a regular basis for a period of approximately one year" was sufficient to create question of fact to preclude summary judgment on hostile work environment claim, and also citing *Walker* for the same proposition for an over three-year period).

A reasonable jury could also find that the harassment was severe; "physically threatening or humiliating" rather than a "mere[ ] . . . offensive utterance;" and affected Moore's job performance. *See WC&M Enterps.*, 496 F.3d at 399–400. Addison's initial comment bears repeating. Moore testified that, soon after Mr. Moore began working at Excel, beginning in the latter part of 2016 or early part of 2017, Addison referred to African American employee Carl Madison in a conversation with Mr. Moore, stating in substance and effect, "[h]e made me so mad I wanted to call that motherfucker the N-word." (Moore Dep. 87, Doc. 35-3 at 60.) Mr. Moore responded, "Boss, you realize you are talking to a black man?" (*Id.*) At that point, Addison replied, "If a black man and Mexican are standing on a high rise building and they jumped at the same time, which one hit the ground first?" When Mr. Moore responded, "I don't know," Addison hollered, "Who gives a fuck?" (*Id.*) Thus, in addition to referencing the N-word, Addison repeated this offensive joke several times.

Additionally, Moore also said Addison used the above racial terms—"Black motherfucker" or "Black ass" or "Black bitch"—to refer to other Black drivers like Carl Madison, Harold Celestine, and Johnie Taylor, and to other Black non-Excel employees like the security officer David Tutson. (Moore Decl. ¶ 5, Doc. 35-11.) Addison did this in a way that he wanted other people to hear how he treated Moore. (Moore Dep. 85, Doc. 35-3 at 58; Moore Decl. ¶ 6, Doc. 35-11.) Thus, Addison's conduct was calculated to humiliate Moore and the other African-Americans.

The Court also notes that Marion Berry, a former African American truck driver with Excel, testified that, in his brief period working at the Louisiana Pigment facility in October or November 2017, he heard Addison use the "N" word to refer to another African-American coworker in a conversation in reference to an accident the other employee was involved in. (Berry Decl. ¶ 5, Doc. 35-16.) Addison was talking to his boss. (*Id.*) Defendant complains that this is hearsay, but it's a statement against a party opponent and thus not hearsay. *See* Fed. R. Evid. 801(d)(2)(D). In any event, hearsay is generally admissible now with summary judgment motions.[2] *See Barnett v. Louisiana Dep't of Health*, No. 17-1793, 2023 WL 2467876, at *2 (M.D. La. Mar. 10, 2023) (deGravelles, J.) (laying out authorities for this in Legal Principle #4). Defendant also describes this evidence as irrelevant, but the Court disagrees; this evidence has a strong tendency to show Addison's attitude and intent toward African-Americans generally and Plaintiff in particular. *See* Fed. R. Evid. 404(b)(2). It also shows an absence of mistake. *See id.* Finally, the evidence easily passes under Fed. R. Evid. 403.

---

[2] Specifically, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form. . . . The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Barnett v. Louisiana Dep't of Health*, No. 17-1793, 2023 WL 2467876, at *2 (M.D. La. Mar. 10, 2023) (deGravelles, J.) (quoting *Ali v. Dist. Dir.*, 209 F. Supp. 3d 1268, 1276 (S.D. Fla. 2016)).

Moreover, Addison's harassment went beyond harsh language, all in a way that establishes harassment. Again, Tutson testified how Addison investigated Plaintiff for allegedly stealing time, and even told Tutson that Plaintiff was guilty of that misconduct. (Tutson Decl. ¶ 5, Doc. 35-13; Tutson Dep. 50–55, Doc. 35-12 at 23–28.) Likewise, Grimm also recalled an incident in 2020 when Addison singled Moore out and complained to Grimm about Plaintiff's time sheets, said something to the effect that Moore was a "lazy motherfucker" or "lazy piece of crap," and that Moore should be fired. (Grimm Decl. ¶ 8, Doc. 35-14.) Grimm said that he knew from observing Moore that Moore did not use his phone any more than any other co-worker. (*Id.*) These types of accusations have specifically been cited as an example by the Fifth Circuit of a type of harassment. *See Johnson*, 916 F.3d at 417–18 (citing as evidence of harassment the fact that plaintiff "endured," *inter alia*, "false accusations of wrong doing [and] name calling," and was "investigated for fraud").

Similarly, in 2018 or early 2019, Addison told Moore that he wanted Moore to write himself up for the dust cap blowing off of his truck, and, when Moore refused, Addison grabbed him by the arm and drug him out of the trailer. (Moore Dep. 120–121, Doc. 35-3 at 93–94.) This is precisely the kind of physically threatening conduct which is considered harassment. *See Johnson*, 916 F.3d at 417–18 (finding plausible claim for harassment stated when Plaintiff alleged that "there were occasions when the tension between [the plaintiff] and [his supervisor] was 'so intense that the potential for physical aggression and altercation appeared imminent.'").

Further, after Moore reported Addison to HR in June 2020, Addison issued Moore a disciplinary writeup accusing him of working a non-scheduled date (i.e., working a Saturday when he wasn't supposed to) and of writing false information on his time sheet pertaining to the amount of time he worked on a particular day; Mark Reed, the Site Supervisor, met with Plaintiff, had him

sign a statement, and issued a verbal warning Addison told him to issue. (Doc. 35-21 (June 29, 2020, write up); Reed Dep. 71–78, Doc. 35-4 at 31–38; *see also DRSIMF* ¶ 33, Doc. 44-2.) This was a form of disciplinary action that, if Moore did not improve, could lead to further discipline. (Reed Dep. 78, Doc. 35-4 at 38.) Reed testified that he had only issued one or two warning notices to Moore before, and they would've been years before. (*Id.* at 108, Doc. 34-4 at 48.) The situation was so severe that Grimm warned Plaintiff "to be careful" because Addison "was trying to get rid of [him]" and make him leave. (Moore Dep. 128, Doc. 35-3 at 101.) Jonathan Taylor likewise told him "more than once" to "watch [him]self" and that Addison "has it hard on for [Plaintiff]." (*Id.* at 138, Doc. 35-3 at 111.) Contrary to Defendant's position, these types of write ups can in fact contribute to a harassment claim. *See WC&M Enters.*, 496 F.3d at 400–01 (citing a "written warning" as an example of harassment); *Johnson*, 916 F.3d at 417–18 (again referencing false accusations of wrong doing).

Plaintiff also cites the fact that, after he reported Addison to HR, Addison began to cut Plaintiff's hours. Moore testified that he "went from 60 hours sometimes to working 40, 30-something hours, sometimes 50." (Moore Dep. 82–83, Doc. 35-3 at 55–56.) According to Plaintiff, Addison would only put Plaintiff somewhere else to make his hours when "someone else didn't show up to work." (*Id.*) Moore would be sent home when other drivers weren't, (*id.* at 90, Doc. 35-3 at 63), and Moore said he was the only driver willing to relieve other drivers in their trucks. (*Id.* at 93, Doc. 35-3 at 66.) Moore accounted for having the same or more hours than others (based on Excel's spreadsheet) by the fact that the entries involve "different positions, different trucks." (*Id.* at 98, Doc. 35-3 at 71.) Moore typically worked 60 hours per week as a Coke truck, whereas those working 36 or 46 hours were working in a whole other section of trucks." (*Id.* at 98–99, Doc. 35-3 at 71–72.) Moore said he didn't make his 60 hours per week. (*Id.*) When Moore worked

neutralization, they had a 36-hour or 48-hour week. (*Id.* at 100–01, Doc. 35-3 at 73–74.) Further, two employees (Mr. Desotell and M. Celestin) had fewer hours on a particular week because they worked 28 hour and 38 hour shifts on their trucks, respectively. (*Id.* at 104–06, Doc. 35-3 at 77–79.) Again, Coke truck drivers had 60 hours per week. (*Id.*) Defendant disputes Plaintiff's characterization of the records, but that merely highlights that these are questions of fact.

Moore's belief that his hours were being cut is further supported by other evidence in the record. First, Moore made a contemporaneous complaint in Cheryl Matt's office in May 2020 about his hours being cut while other White employee's hours were not similarly cut. (*Id.* at 128, Doc. 35-3 at 101.) In support of this, Matt testified that he also recalls Moore complaining about his hours. (Matt Dep. 63, Doc. 35-8 at 27.) Even stronger, Aaliyah Landry testified that Addison and Reed were racist in hiring and assignments; for example, Addison "only allowed Caucasians to work at the landfill, where they were treated better than the rest of us working at the end dump." (Landry Decl. ¶ 8, Doc. 35-17.) All of this highlights the existence of questions of fact on the issue of whether Moore's hours were in fact cut.

Finally, the incident involving Addison and Moore's then fiancé, now wife, presents strong support of severe harassment by Addison. Moore testified:

> Q. Then the hurricane occurs, and that's when Mr. Addison said something to your wife on the phone, and she called looking for you -- that was of a sexual nature?
>
> A. He told my wife if she needed anything. And he emphasized it again. "I mean anything. Don't call him. Don't call – don't call Weldon. Call me." And that made my wife feel kind of bad, and it really, really, really pissed me off, you know, because it's not only on the job now. He done take a step to come into my home now. And I talked to Mr. Dunn about that, and I strongly believe it pissed him off because of his reaction. He said, "If Jeff going to do that, he can't work for him."

(Moore Dep. 134–35, Doc. 35-3 at 107–08.) Another employee—Josh Arabie, one of the landfill hands—also heard Addison say this. (*Id.*) Tutson testified that he saw Moore "looking really upset. He was breathing heavily and looked agitated. Johnny Taylor, an African American foreman, was there trying to calm him down." (Tutson Decl. ¶ 9, Doc. 35-13.) Tutson said he "had never seen [Moore] look so upset as [Tutson] saw him that day in the break room. Both Johnnie Taylor and [Tutson] tried calming [Moore] down. [Moore] threatened to quit, and [Tutson] tried telling him to just power through the rest of the override and get the extra pay. He eventually calmed down." (*Id.*)

The Court rejects Defendant's efforts to downplay and dismiss this incident. Defendant claims that Addison denies these allegations, (Doc. 44-2 at 22–23), but that further highlights the questions of fact on this issue. Defendant also claims the incident is irrelevant, but the Court finds this highly relevant to demonstrate the severe and humiliating harassment to which Plaintiff was subjected. Indeed, it strikes the Court as odd to say that Addison's harassment did not affect a term or condition of employment when it affected Moore so much that he had to be talked out of quitting his job. *See WC&M Enters.*, 496 F.3d at 399–400 ("[t]he Supreme Court has emphasized that Title VII's prohibition is not limited to 'economic' or 'tangible' discrimination."). And all of this, when combined with the other evidence presented above, could lead a reasonable juror to conclude that Addison's actions were directly caused by Moore's race.

In sum, summary judgment on this issue is inappropriate. Some of this harassment—the offensive joke, false accusations of misconduct, and the incident with Moore's wife—are likely sufficient on their own to support a harassment claim. But, even if "no single incident of harassment [was] likely sufficient to establish severe or pervasive harassment, when considered together and viewed in the light most favorable to [Moore], the evidence shows a long-term pattern

18

of ridicule sufficient to establish a claim under Title VII" and thus § 1981. *WC&M Enters.*, 496 F.3d at 400–01. As a result, Defendant's motion on this issue will be denied.

    b.   <u>Whether Excel took Reasonable Care to Prevent the Harassment</u>

    Again, the final element of a hostile work environment claims is that "the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Price v. Wheeler*, 834 F. App'x 849, 860 (5th Cir. 2020) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). The Fifth Circuit has explained:

> "[A] plaintiff need not show that the employer knew about the harassment if the claim involves the acts of a supervisor. To that extent, an employer is vicariously liable for the actions of its supervisory employees. The employer has an affirmative defense to liability or damages in this instance with proof that (1) the employer took reasonable care to prevent the harassing behavior and (2) the employee failed to take advantage of such preventative or corrective opportunities. The employer is not entitled to raise the affirmative defense, however, if the harassment takes the form of a tangible employment action. *Watts v. Kroger Co.*, 170 F.3d 505 (5th Cir. 1999). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

*Price*, 834 F. App'x at 860 n.8.

    Here, there's no dispute that Addison was a supervisor, but there's some question as to whether Defendant properly pled the relevant affirmative defense. The Court finds that, while Defendant did not expressly invoke the *Faragher/Ellerth* defense, a fair reading of Defendant's Answer shows that Excel attempted to do so. (*See* Doc. 14 (14th, 16th, and 18th Affirmative Defenses)).[3]

---

[3] Defendant pled:

**FOURTEENTH AFFIRMATIVE DEFENSE**

But, though Plaintiff has pled this defense, the Court finds that Excel has failed to show it is entitled to judgment on it. Before the Court turns to the facts, it must first emphasize Defendant's burden on this issue:

"[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure [(that is, beyond doubt)] all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *peradventure*, Merriam-Webster's Dictionary (2022), https://www.merriam-webster.com/dictionary/peradventure (last visited July 13, 2022); *see also Universal Sav. Ass'n v. McConnell*, No. 91-6197, 1993 WL 560271, at *2 (5th Cir. Dec. 29, 1993) (unreported) ("Where the summary judgment movant bears the burden of proof at trial, the summary judgment evidence must affirmatively establish the movant's entitlement to prevail as a matter of law."). That is,

> In contrast, if the movant bears the burden of proof on a claim at trial, then its burden of production is greater. It must lay out the elements of its claim, citing the facts it believes satisfies those

---

Defendant did not violate the laws or legal claims cited in the First Amended Complaint; alternatively, Defendant made good-faith efforts to comply with such laws and, at all relevant times to this action, Defendant had reasonable grounds for believing its actions with respect to Plaintiff were not in violation of any law, rule, regulation, or guideline. . . .

**SIXTEENTH AFFIRMATIVE DEFENSE**
Defendant denies that Plaintiff was discriminated against, harassed, retaliated against, or terminated by Defendant. In the alternative, at all material times, Defendant Excel maintained and enforced appropriate, good faith policies and procedures prohibiting unlawful discrimination, harassment and retaliation in the workplace. Such policies and procedures established specific methods for reporting, investigating and, if warranted, for obtaining remediation of such alleged conduct. . . .

**EIGHTEENTH AFFIRMATIVE DEFENSE**
Defendant avers that it took prompt and remedial action upon receiving Plaintiff's complaint of discrimination and harassment, and that since taking such action, Plaintiff has not complained of any other acts of discrimination, harassment or retaliation.

(Doc. 14 at 17–18.)

> elements, and demonstrating why the record is so one-sided as to
> rule out the prospect of the nonmovant prevailing. If the movant fails
> to make that initial showing, the court must deny the motion, even
> if the opposing party has not introduced contradictory evidence in
> response.

10A Mary Kay Kane, *Federal Practice and Procedure (Wright & Miller)* § 2727.1 (4th ed. 2022).

Here, Defendant has not established that all reasonable jurors would conclude that "[Excel] took reasonable care to prevent the harassing behavior." First, a reasonable juror could conclude that there were deficiencies with Excel's HR system. Until 2019, the Excel administrative offices in Lake Charles did not have a Human Resources ("HR") department. (*DRSIMF* ¶ 9, Doc. 44-2 (admitted)). In 2019, Cheryl Matt, who until then was a recruiter for Excel in its Lake Charles administrative offices, was given an added role of HR generalist, of which her primary function was to assist Excel employees with issues relating to their employee benefits and insurance. (*Id.* ¶ 10.) Matt did not report to anyone in HR, and there were no Excel HR personnel charged with overseeing HR policies in the Lake Charles area. (*See* ¶ 11.) Other than a January 2018 anti-harassment training session held for Excel management, Matt underwent no training on Excel's anti-harassment policy. (*Id.* ¶ 13.) Landry testified that "Excel did not administer anti-harassment training during the entire time [she] worked there." (Landry Dep. ¶ 7, Doc. 35-17.) Robert Lout, Excel Project Manager, likewise testified that he did not remember ever taking any anti-harassment training there. (Lout Dep. 62, Doc. 35-9 at 34.) All of this creates questions of fact about the adequacy of Excel's efforts to prevent harassment.

Moreover, Plaintiff also presented evidence that Excel failed to take reasonable care to prevent the harassing behavior after Moore initially reported it. Moore testified that he first complained about the harassment on August 13, 2017. (Moore Dep. 116–18, Doc. 35-3 at 89–91.) Matt didn't take any contemporaneous notes during this meeting. (Matt Dep. 69, Doc. 35-8 at 33.)

According to Moore, Matt told Moore to write everything down that had happened, but she didn't say she would talk to Mr. Lout, Mr. Dunn, or anybody else. (Moore Dep. 118–19, Doc. 35-3 at 91–92.) As explained above, the abuse escalated after this complaint.

Nothing changed, and in May 2020, Moore called Lout and told him he was still having problems with Addison and was being discriminated against. (Moore Dep. 125–26, Doc. 35-3 at 98–99.) The next day, he went to Lout's office and then was asked to go to Matt's office where Matt and Addison were. (*Id.* at 124–25, Doc. 35-3 at 97–98.) Plaintiff testified that he "explained to them what happened, and [he] didn't receive any help." (*Id.* at 128, Doc. 35-3 at 101.) That is, he complained about his hours and "the racial discrimination and the racial name-calling[ ]." (*Id.* at 83–84, Doc. 35-3 at 56–57.)

Cheryl Matt did not take notes during the meeting. (*DRSIMF* ¶ 50, Doc. 44-2.) Matt created a document purporting to reflect her recollection of the meeting (Pl's Ex. 16) approximately nine months later, on February 9, 2021, in response to a request for information concerning such meeting from either HR or Excel's counsel one day after Mr. Moore sent Excel a document preservation letter. (*DRSIMF* ¶ 51, Doc. 44-2.) That document does not contain everything that was said at the meeting. (Matt Dep. 86, Doc. 35-8 at 50.) Matt did not interview Michael Grimm about things that Addison reportedly said, nor did Matt investigate Moore's complaint. (Matt Dep. 78–80, Doc. 35-8 at 42–44.) Matt was not aware of anyone else in management coming to her about Addison, and Matt did not follow up on Moore's complaint and was unaware of Addison ever being investigated. (*Id.* at 81–82, 87, Doc. 35-8 at 45–46, 51.) Lout likewise never had any follow up conversation with Matt after the meeting, so there was no documentation concerning the meeting, and he did not know of the outcome. (Lout Dep. 31–32, Doc. 35-9 at 12–13.) And all of

this occurred despite the fact that, according to Moore, Addison said nothing during the meeting and ended it by calling Moore a "motherf—er." (Moore Dep. 130, Doc. 35-3 at 103.)

Construing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in his favor, a reasonable juror could easily find that Excel failed to take reasonable care to prevent future harassment, which did in fact continue until the incident with Moore's wife. Addison formally resigned from Excel in or around October 2020. (*DRSIMF* ¶ 87, Doc. 44-2.) At no point did Excel discipline Addison for complaints made against him regarding harassment. (*Id.* ¶ 90.) As shown above, its investigation failed to show due care. And Addison's termination paperwork reflects Excel's position that Addison is eligible for rehire, despite Moore's uninvestigated complaints. (*Id.* ¶ 91.)

For all of these reasons, summary judgment is inappropriate. Plaintiff easily shows questions of material fact on his harassment claim, and, consequently, Excel's motion will be denied.

### B. Retaliation

#### 1. Parties' Arguments

Defendant asserts that Plaintiff's retaliation claim fails. (Doc. 26-2 at 8.) According to Defendant, Plaintiff alleges retaliation after he complained of the racist comments in the form of a reduction of hours, unwarranted write-ups, and termination (following his filing suit). (*Id.*) Defendant maintains that Plaintiff fails the second and third elements of a prima facie case of retaliation—that is, (a) no adverse employment action was taken against him, and (b) there was no causal connection between any such protected conduct and the alleged adverse action. (*Id.* at 9.) As to the first, Defendant contends that there is no evidence that Moore's hours were reduced, and the write ups had zero effect on his pay, title, position, or benefits. (*Id.* at 10.) Moreover, the alleged

termination occurred well after Addison resigned, making it too remote in time. (*Id.*) Plaintiff also cannot show that the complaint was a "but for" reason for resignation, given that Excel had a legitimate, non-retaliatory reason—namely, the significant product spill Plaintiff caused. (*Id.*) In any event, Plaintiff voluntarily resigned, which precludes his claim because Plaintiff has failed to satisfy the high burden of constructive discharge. (*Id.* at 10–11.) Plaintiff's subjective belief that he was fired is insufficient to establish a claim of constructive discharge. (*Id.* at 12.) And again, Addison departed in October 2020, which created about a fourteen-month gap between the harassment and the resignation. (*Id.*) Lastly, the investigation into the spill was not out of the ordinary, and Moore was not treated differently from other employees. (*Id.* at 12–13.)

Plaintiff counters that he has presented sufficient evidence that, after he complained to HR about Addison, he suffered materially adverse actions in the form of disciplinary write ups, a cutback in hours, and (shortly after his lawsuit) a termination of employment (which Excel mischaracterizes as a "suspension"). (Doc. 35 at 15.) Further, Plaintiff contends that the temporal proximity was in fact short. (*Id.*)

On the adverse action requirement, Plaintiff emphasizes that the key is whether the alleged conduct would dissuade a reasonable worker from making or supporting a charge of discrimination. (*Id.* at 16.) Plaintiff then recaps the evidence, explaining how Addison wanted to "get rid" of him, would humiliate him in front of other employees, would cut his hours and thus reduce his compensation, would give Plaintiff jobs only others were unwilling to do, and would subject him to disciplinary write ups and accusations of misconduct. (*Id.* at 17–18.) Plaintiff also disputes Defendant's characterization of his termination as a voluntary resignation. (*Id.* at 19.) Plaintiff says there are questions of fact here, as Plaintiff was told not to return to work eight days after filing the lawsuit, and he did not hear back from Excel until the day after he filed his amended

complaint alleging termination. (*Id.* (citing *SIMF* ¶ 117, 123–24).) In any event, a disciplinary suspension can also constitute an adverse employment action, and Defendant does not address that. (*Id.*)

Plaintiff also maintains he satisfies the causal connection requirement too. (*Id.* at 19–20.) Moore met with Matt and Lout in June 2020 about Addison's behavior, and, by August 2020, Addison engaged in the above adverse actions. (*Id.* at 20 (citing *SIMF* ¶ 53, 66–68, 72).) As to the termination, Moore served the instant lawsuit on Excel on January 3, 2022, and, eight days later, Excel VP Dunn called Moore and told him not to return to work until Moore heard back from him. (*Id.* (citing *SIMF* ¶ 117).) The radio silence continued until February 10, 2022, when Moore amended his complaint to allege retaliatory termination, and only then did Moore hear back. (*Id.* at 20–21 (citing *SIMF* ¶ 123–24).)

Plaintiff then contends that Excel failed to meet its burden of production to bring forward competent summary judgment evidence to show that the actions were for nondiscriminatory or non-retaliatory reasons. (*Id.* at 21.) Plaintiff largely disputes Defendant's evidence that the investigation and suspension were normal procedure in light of the above timeline. (*Id.* at 21–22.)

Even if Defendant had met this burden, says Plaintiff, the "record is rife with evidence of pretext." (*Id.* at 22.) Plaintiff provides law that pretext can be shown from a departure from standard procedure and from a lack of documentation in a way that matters. (*Id.* at 22–23.) Both of those are present here with respect to Moore's termination, along with the testimony of other employees. (*Id.* at 23.) Plaintiff then highlights the facts in support of this. (*Id.* at 23–26 (citing *SIMF* ¶¶ 97–98, 103, 109, 111–12, 116–18, 120–130, 134).)

Defendant responds that the alleged harassment did not rise to a level sufficient to constitute retaliation. (Doc. 44 at 4.) Again, write ups that do not result in a loss of pay aren't

sufficiently severe, and the evidence shows that Plaintiff did not suffer a reduction in hours. (*Id.*) Defendant emphasizes its version of the facts: that Plaintiff admitted in his own handwriting that the accident occurred and was his fault, that he was suspended and, within days, sought other employment, and that he was told he could unconditionally return to work. (*Id.* at 5.) Moreover, again, Plaintiff's complaints about Addison occurred 16 months before his alleged termination. (*Id.*) Defendant disputes each of the facts highlighted by Plaintiff, arguing that the length of the investigation and Plaintiff's subjective belief in termination do not constitute retaliation or constructive discharge. (*Id.* at 6–7.)

### 2. *Retaliation Standard Generally*

"Title VII prohibits employers from retaliating against employees who oppose an employment practice made unlawful by Title VII." *Allen v. Envirogreen Landscape Pros., Inc.*, 721 F. App'x 322, 325 (5th Cir. 2017) (citing *EEOC v. Rite Way Serv., Inc.*, 819 F.3d 235, 239 (5th Cir. 2016) (quoting 42 U.S.C. § 2000e–3(a))). Employment practices made unlawful "under Title VII include 'fail[ing] or refus[ing] to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Id.* (quoting 42 U.S.C. § 2000e–2(a)(1)). "To establish a prima facie case of retaliation under Title VII, 'a plaintiff must show that (1) [ ]he participated in an activity protected under the statute; (2) [his] employer took an adverse employment action against [him]; and (3) a causal connection exists between the protected activity and the adverse action.' " *Id.* (quoting *Feist v. La. Dep't of Justice, Off. of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013) (citation omitted)).

Once the plaintiff successfully presents a *prima facie* case of retaliation, "the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision." *Allen*, 721 F. App'x

at 325 (quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388–89 (5th Cir. 2007) (citation omitted)). If the "employer does so, the burden shifts back to the employee to demonstrate that the employer's reason is pretext for retaliation." *Id.* "In order to avoid summary judgment, the plaintiff must show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Id.* (quoting *Feist*, 730 F.3d at 454 (quoting *Long*, 88 F.3d at 308)).

Here, the issues are (1) with respect to Plaintiff's prima facie case, (a) did he suffer an adverse employment action; and (b) was there a causal connection between the adverse action and the protected activity; and (2) assuming Defendant provided legitimate, non-discriminatory reasons, did Plaintiff present sufficient evidence to establish pretext? The Court will take each of these in turn.

### 3. Prima Facie: Adverse Employment Action

The question of whether Plaintiff suffered an adverse employment action is governed by the Supreme Court's decision in *Burlington Northern*. According to this case, the antiretaliation provision of Title VII "extends beyond workplace-related or employment related retaliatory acts and harm." *Burlington N.*, 548 U.S. at 67. Phrased another way, "the challenged actions" need not be "related to the terms or conditions of employment." *Id.* at 70. Retaliation actions are not limited to "ultimate employment decisions" such as "hiring, granting leave, discharging, promoting, and compensating." *Id.* at 60, 67.

Nevertheless, "the antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. To demonstrate retaliation, "a plaintiff must show that a reasonable employee would have found the challenged action materially

adverse, which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Id.* at 68 (citation omitted).

The standard is "*material* adversity" because it is "important to separate significant from trivial harms. Title VII . . . does not set forth 'a general civility code for the American workplace.'" *Id.* (emphasis in original) (internal citations omitted). As *Burlington Northern* explains:

> An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and " 'snubbing' by supervisors and co-workers" are not actionable under § 704(a) ). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. [*Robinson v. Shell Oil Co.*, 519 U.S. 337, 346[ ] (1997)] It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual § 8, p. 8–13.

*Id.*

The material adversity standard is also that of a "*reasonable* employee" because "the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68–69 (emphasis in original).

The *Burlington Northern* standard is set forth in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Id.* at 69. For example, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training

lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.* at 69.

Here, Plaintiff alleges the following adverse employment actions: (1) cutting his hours and thus affecting his compensation; (2) writing Plaintiff up and accusing him of misconduct; and (3) either terminating him or, at the very least, disciplining him. The Court will take each of these in turn.

First, it is clear that, regardless of its characterization, Plaintiff's suspension or termination constituted an adverse employment action. *See Hypolite v. City of Hous., Tex.*, 493 F. App'x 597, 607 (5th Cir. 2012) ("[A] temporary suspension without pay is an adverse employment action."); *Rougeau v. La. Dep't of Soc. Servs.*, No. 04-432, 2008 WL 11355054, at *6 (M.D. La. July 10, 2008) (Brady, J.) ("[T]he only acts sufficient to support a Title VII claim are [plaintiff's] suspension and subsequent termination.").

Second, false accusations can constitute adverse employment actions. *See Mullinax v. Cook Sales, Inc.*, No. 16-92, 2016 WL 6839461, at *3 (S.D. Miss. Nov. 21, 2016) ("Here, Plaintiff alleged that the written warning was based on false and exaggerated accusations. Accordingly, she pled sufficient facts to state a colorable retaliation claim arising from the warning."); *Al-habash v. Raytheon Co.*, No. 15-450, 2016 WL 6155601, at *8 (E.D. Tex. Oct. 24, 2016) (finding that magistrate judge correctly recommended that prima facie case for retaliation was met because "colorable grounds for Plaintiff's [performance improvement plan] did not exist when Plaintiff received 'meets expectations' ratings in those annual reviews prior to his supervisors learning of his engagement in protected activity"); *cf. Jackson v. Honeywell Int'l, Inc.*, 601 F. App'x 280, 286 (5th Cir. 2015) ("[W]ritten warnings and unfavorable performance reviews are not adverse employment actions where colorable grounds exist for disciplinary action . . . ."); *Melancon v.*

*Lafayette Gen. Med. Ctr., Inc*., No. 22-30704, 2023 WL 6621679, at *3 (5th Cir. Oct. 11, 2023) (rejecting retaliation claim in part because plaintiff did "not allege that the accusations [were] untrue, exaggerated, or taken out of context").

However, write ups alone do not rise to the level of an adverse employment action. As the Court in *Melancon* found:

> Although the July 2021 reprimand states that "[a]ny future infractions may result in further disciplinary action up to and/or including termination of employment," [the plaintiff employee] has not alleged that the report itself gave rise to negative employment consequences. *See, e.g., Thibodeaux-Woody v. Houston Comm. College*, 593 F. App'x 280, 286 (5th Cir. 2014) (citing *Hernandez v. Johnson*, 514 F. App'x 492, 499 (5th Cir. 2013)) (holding that an inconsequential reprimand, without more, does not constitute an adverse employment action); *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 214 F. App'x 437, 442 (5th Cir. 2007) (a single written warning, without evidence of consequences, is insufficient under *Burlington Northern*).

*Melancon*, 2023 WL 6621679, at *3. *See also Rougeau*, 2008 WL 11355054, at *5 ("Indeed if every unfavorable performance review or reprimand constituted a material adverse employment action under Title VII, courts and administrative bodies would become unfettered arbiters of Title VII's remedial mechanisms.").

The Court finds *Melancon* persuasive. Because Plaintiff does not allege any consequences flowing from his write ups or the false accusations against him, the Court finds that a reasonable juror could not conclude that either action rises to the level of an adverse employment action under *Burlington Northern*. These retaliation claims will thus be dismissed.

Third, the Court already found sufficient evidence that there was a question of fact on whether Plaintiff's hours were in fact cut. The Court finds that these actions might dissuade a worker from making a charge of discrimination. *See Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 666 (W.D. Tex. 2014) ("Because a reduction in hours—and, consequently, the reduction in associated

income—could dissuade a reasonable employee from making or supporting a charge of discrimination, a reduction in hours can be an adverse employment action in the retaliation context." (citing *Badii v. Rick's Cabaret Intern., Inc.*, No. 12–4541, 2014 WL 550593, at *17 (N.D. Tex. Feb. 11, 2014) (finding that shift reduction can be an adverse employment action in the retaliation context); *McNairy v. Chickasaw Cnty., Miss.*, No. 09–59, 2010 WL 3813612, at *4 (N.D. Miss. Sept. 22, 2010) (finding that a reduction in hours constituted an adverse employment action for retaliation); *Harris v. Fresenius Med. Care*, No, 04–4807, 2006 WL 2065313, at *19 (S.D. Tex. July 24, 2006) (finding that hours reduction could be an adverse employment action for retaliation purposes, but was not because the employer provided a legitimate, non-discriminatory reason for that reduction))); *Green v. Tri-Con, Inc.*, No. 21-481, 2023 WL 9185691, at *11 (E.D. Tex. Oct. 17, 2023), *report and recommendation adopted*, 2024 WL 95350 (E.D. Tex. Jan. 9, 2024) ("A reduction in hours is an 'adverse employment action' for retaliation purposes." (citing *Eure*, 61 F. Supp. 3d at 666)). Thus, Plaintiff met his burden on this issue.

### 4. *Prima Facie: Causal Connection*

"At the prima facie stage, 'the standard for satisfying the causation element is 'much less stringent' than a 'but for' causation standard.' Nevertheless, the plaintiff must produce some evidence of a causal link between the protected activity and the adverse employment action to establish a prima facie case of retaliation." *Eure*, 339 F. Supp. 3d at 385 (quoting *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003)). "[T]he mere fact that some adverse action is taken *after* an employee engages in some protected activity will not always be enough for a *prima facie* case." *Owens v. Circassia Pharms., Inc*., 33 F.4th 814, 835 (5th Cir. 2022) (quoting *Swanson v. GSA*, 110 F.3d 1180, 1188 n.3 (5th Cir. 1997)). "Nevertheless, '[c]lose timing' between the protected activity and adverse action can establish the causal link required to assert a prima facie

31

case." *Id.* (quoting *Swanson*, 110 F.3d at 1188). *See id.* ("An interval of weeks between [plaintiff's]

complaints and her termination is certainly close timing, so we agree with the district court and

hold that [plaintiff] has established a prima facie case."). As this court has explained:

> For example, in *Garcia*, the Fifth Circuit found that the plaintiff
> established the causation prong for purposes of his prima facie case
> based solely on the two-and-a-half-month gap in time between the
> protected activity and adverse action. [*See Garcia v. Pro. Cont.
> Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019)]. In determining
> whether this temporal proximity was close enough to establish a
> causal connection, the Fifth Circuit explained:
>
>> This court has previously held that a period of two
>> months is close enough to show a causal connection.
>> *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987,
>> 994–95 (5th Cir. 2005). We have even suggested that
>> four months is close enough. *Evans v. Cty. Of
>> Houston*, 246 F.3d 344, 354 (5th Cir. 2001). The
>> Supreme Court has since approvingly cited a case
>> that held three months was insufficient to show
>> causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532
>> U.S. 268, 273–74 [ ] (2001). But Garcia's two-and-
>> one-half-month period still fits comfortably within
>> the time periods of both our case law and *Breeden* to
>> establish causation. . . .
>
> *Id.* Yet, in a different case, the Fifth Circuit concluded that "two and
> one-half months between the protected activity and the adverse
> employment decision, standing alone, [was] not within the 'very
> close' proximity that is necessary to establish causation." *Besser v.
> Tex. Gen. Land Off.*, 834 F. App'x 876, 885 (5th Cir. 2020).

*Henderson v. Bd. of Supervisors of S. Univ. & A&M Coll.*, 663 F. Supp. 3d 542, 568 (M.D. La.

2023) (deGravelles, J.)

As in *Henderson*, the Court need not determine whether a two and one-half month gap is

sufficiently close. *Id.* Here, Moore complained about racial harassment around August 13, 2017.

(Moore Dep. 116–18, Doc. 35-3 at 89–91.) But Moore was consistently unable to name when his

hours first began to be cut. (*See id.* at 82–83, Doc. 35-3 at 55–56 (stating, when asked "When were

your hours cut?," "I can't remember exactly what date," and then not answering what year it occurred in); *id.* at 99–100, Doc. 35-3 at 72–73 (saying he couldn't remember when he became a swing driver but then saying it "had to be 2020, 2019); *id.* at 103–06, Doc. 35-3 at 76–79 (complaining of hours lost in 2020); *id.* at 108, Doc. 35-3 at 81 ("hav[ing] no idea" when Addison asked him to be on the ride-out team); *id.* at 119–20, Doc. 35-3 at 92–93 (stating that sometime after the August 2017 meeting he started complaining that his hours were cut, but testifying that he "[couldn't] remember specific dates," and being unable to answer whether this occurred "weeks? Months? Years?" after the August 2017 meeting). Consequently, Plaintiff has failed to show a close timing between the initial complaint of discrimination in August 2017 and the May 2020 meeting, and thus Plaintiff's retaliation claim related to his reduced hours will be dismissed. *See Besser*, 834 F. App'x at 885; *Santhuff v. United Parcel Serv., Inc.*, No. 17-1404, 2019 WL 4545610, at *24 (M.D. La. Sept. 19, 2019) (deGravelles, J.) (finding that the "two-year period" between the plaintiff's complaints and his subsequent discipline was "well beyond the four-month period" by the Fifth Circuit's suggested upper limit).

This leaves only the alleged termination or suspension without pay. Plaintiff filed the instant lawsuit in December 2021, (Doc. 1), and, on January 3, 2022, Excel was formally served with the summons and Complaint, (Doc. 35-26 at 2.) On or around January 11, 2022, eight days after Excel was served with Moore's lawsuit, Excel VP Shaun Dunn called Moore and told him not to return to work until Moore heard back from him. (*DRSIMF* ¶ 117, Doc. 44-2.) Thus, Plaintiff has met his *prima facie* burden of showing a causal connection between the retaliatory termination or suspension and the protected activity of filing suit.

### 5. *Legitimate, Non-Discriminatory Reason*

Plaintiff contends that Defendant has failed to meet its burden in offering a legitimate, non-discriminatory reason for the termination/suspension, but the Court disagrees. "If the plaintiff makes a prima facie showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action. The employer's burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (citations omitted), *abrogated on other grounds by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023).

Here, Excel has submitted evidence that Plaintiff was suspended without pay because of the product spill. (Moore Dep. 48–51, Doc. 26-3 at 27–30; Dunn Dep. 162–63, Doc. 26-12 at 29–30.) Regardless of whether this was in good faith or not, the Court finds that Excel has met its burden of production to provide a legitimate, non-discriminatory reason, so the Court will move on to the question of pretext.

### 6. *Pretext*

"The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse employment decision." *Saketkoo v. Administrators of Tulane Educ. Fund*, 31 F.4th 990, 1001 (5th Cir. 2022) (quoting *Long*, 88 F.3d at 305 n.4); *see also Owens*, 33 F.4th at 835. "Because [Defendant has] carried [its] burden of production, this court turns to whether [Moore] can prove [his] claim according to traditional principles of 'but for' causation and carry [his] burden of demonstrating that [Defendant's] proffered non-discriminatory reason is pretextual." *Saketkoo*, 31 F.4th at 1002.

> An employee can establish pretext in the context of retaliation by showing that a discriminatory motive more likely motivated her employer's decision. In order to survive a motion for summary judgment, the plaintiff must show a conflict in substantial evidence

> on this issue. At this juncture, we consider numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.
>
> There will be cases where a plaintiff has [ ] established a prima facie case . . . yet no rational factfinder could conclude that the action was discriminatory.

*Id.* (cleaned up).

> This inquiry requires a greater showing than mere causal connection. It requires that the plaintiff show that protected conduct was *the* reason for the adverse action. In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct. Plaintiffs may combine suspicious timing with other significant evidence of pretext to survive summary judgment . . . .

*Owens*, 33 F.4th at 835 (cleaned up).

"[A] lack of contemporaneous documentation, alone, is not evidence of pretext; the employee must also demonstrate why the absence of documentation matters. Otherwise, there would be no basis upon which a jury could infer pretext." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015). Thus, for instance, in *Burton*, the Fifth Circuit concluded:

> Here, the lack of documentation matters because the defendants charge Burton with a "history of performance problems" but can show only a pair of dated, neutral performance reviews, a single mistake, and (maybe) unauthorized use of the Internet. Their attempt to buttress the charge by compiling documentation after the fact only highlights the relevance of the absent documentation.

*Id.*

Likewise, "[a] plaintiff can also show pretext by showing a departure from standard procedure. But mere deviations from policy, or a disagreement about how to apply company policy, do not show pretext." *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934

35

F.3d 447, 459–60 (5th Cir. 2019) (applying in context of ADEA) (citing *Campbell v. Zayo Grp., L.L.C.*, 656 F. App'x 711, 715 (5th Cir. 2016) (per curiam) (unpublished) (holding that "mere disagreement with [the employer's] application of the [reduction-in-force] policy, without more, does not provide substantial evidence of pretext"); "Even if a plaintiff can show that an employer consciously disregarded its own hiring system, that showing, on its own, does not conclusively establish that . . . a nondiscriminatory explanation for an action is pretextual." *Brown v. San Antonio Food Bank*, No. 23-50564, 2024 WL 1300286, at *5 n.26 (5th Cir. Mar. 27, 2024). The key is whether Excel was "willing to deviate from established procedures in order to accomplish a discriminatory goal." *Id.* at *5 (citation omitted) .

Having carefully considered the matter, the Court finds that Plaintiff has satisfied his burden of showing pretext. First, as explained earlier, there was extremely close timing between the suspension or termination and the protected activity of filing suit and Defendant being served with it. (*See DRSIMF* ¶ 117, Doc. 44-2.) Moreover, Plaintiff amended his complaint on February 10, 2022, (*Id*. ¶ 123, Doc. 44-2), and only on the following day did Excel inform Plaintiff that he could return to work, (*see id.* ¶ 124.) Again, "Plaintiffs may combine suspicious timing with other significant evidence of pretext to survive summary judgment. . . ."*Owens*, 33 F.4th at 835 (cleaned up).

The Court finds that Plaintiff has met his burden of providing significant evidence of pretext to show that a discriminatory motive more likely motivated Excel's decision and that retaliation was the reason for the adverse action. Again, on February 10, 2022, Mr. Moore filed an Amended Complaint to his lawsuit, alleging that Excel had terminated his employment in retaliation for filing the lawsuit. (*DRSIMF* ¶ 123, Doc. 44-2.) On February 11, 2022, Moore received a text from VP Dunn stating:

> We have completed our investigation into your conduct on 1/9/2022 when you failed to follow establish procedures and close the dump valve on the Ore trailer after unloading product at La. Pigment Silo. Your misconduct resulted in a substantial product spill. Instead of immediately reporting the accident, you used a Skid Steer loader in an attempt to clean and cover up the accident, although you are neither authorized nor trained to operate that piece of equipment. We have determined that you engaged in serious violations of Excel's procedures and safety guidelines. The Company had decided that you will be suspended without pay for three (3) weeks (2/19/2022 to 3/9/2022) and you will be issued a final written warning. Please advise immediately if you intend to return to work, but no later than Monday, February 21, 2022. If I do not hear from you by then, we will consider that you have voluntarily resigned your employment with Excel.

(*See DRSIMF* ¶ 124, Doc. 44-2; Doc. 35-29.)

However, Plaintiff points to substantial evidence demonstrating that this text message and the proffered reasons it offers are not worthy of credence. First, Plaintiff creates doubt about whether the incident in question was indeed a "substantial product spill." Lout testified there was no personal injury or property damage associated with the spill. (Lout Dep. 63–64, 67, Doc. 35-9 at 35–36, 39.) Consequently, he did not recall any specific conversations with the Safety Manager about the spill. (*Id.* at 67, Doc. 35-9 at 39.) Further, Lout did not review the incident report until after Moore was no longer employed with Excel. (*Id.* at 63, Doc. 35-9 at 35.) Reed testified that he had no conversations with anyone about the cause of the spill, and he only spoke to the Project Manager and one other about the extent of the damage. (Reed Dep. 174, 198, Doc. 35-4 at 77, 90.) Doug Stephson, Excel's Safety Manager, testified that no one conducted an investigation with respect to the spill. (Stephson Dep. 73–74, Doc. 35-27 at 38–39.) Moreover, according to Stephson, no one completed a report with respect to the spill or Moore's use of the skid steer. (*Id.*) Stephson also testified there was no physical injury or property damage. (*Id.* at 72, Doc. 35-27 at 37.) A

reasonable juror could conclude from all of this evidence that the spill in question was in fact minor and not worthy of discipline.

Second, Plaintiff pokes substantial holes in Dunn's next statement: "Instead of immediately reporting the accident, you used a Skid Steer loader in an attempt to clean and cover up the accident, although you are neither authorized nor trained to operate that piece of equipment." (*DRSIMF* ¶ 124, Doc. 44-2.).According to Moore, after the spill, Moore immediately called Reed, and Reed told Moore to "[g]et the skid steer and get what you can get up," so Moore got the skid steer with the help of a shift supervisor and scraped up the oil and pushed it to the side. (Moore Dep. 59–61, Doc. 35-3 at 38–40.)

Excel employees contradict this testimony, but not completely. Reed said that Moore called him, but Reed denied telling Moore to use the skid skeer; according to Reed, Moore told Reed that he would do so. (Reed Dep. 111, 155 Doc. 35-4 at 51, 63.) Reed and Dunn both testified that the normal procedure for using the skid steer is to notify the plant, and the plant tells the people whether they need to do something, (*id.* at 155, Doc. 35-3 at 63; *see also* Dunn Dep. 118–19, Doc. 35-23 at 63), but Stephson was not aware of a particular protocol used by Excel employees seeking permission to use the equipment. (Stephson Dep. 66–67, Doc. 35-27 at 31–32.)

There is also a lack of documentation with respect to the spill cleanup. Stephson testified that no one completed a report concerning the spill or Moore's use of the skid steer. (Stephson Dep. 73–74, Doc. 35-27 at 38–39.) Stephson also stated that, though he recorded in his report that no one gave Moore permission to use the skid steer to clean up the spill, he got that information from Reed, who talked to one of the supervisors; but Stephson did not speak with the supervisor and was not aware of any documentation between Reed and the Louisiana Pigment supervisor regarding the clean up. (*Id.* at 66, Doc. 35-27 at 31.) There is also no documentation about someone

from Louisiana Pigment complaining to Excel about Moore's use of the skid steer, even though that would have been documented. (*Id.* at 67, Doc. 35-27 at 32.) Meanwhile, Reed testified that no one documented the cleanup, though only because "[n]obody knew anything about it." (Reed Dep. 183, Doc. 35-4.) Reed did not speak to anyone at Louisiana Pigment who witnessed these events, and he did not speak to the Weight Master. (*Id.*) And here the lack of documentation is critical; it provides additional support for Plaintiff's theory that the real reason for his termination or suspension, was not the spill, but rather unlawful retaliation.

There are also questions of fact as to Dunn's claim that Moore tried to "cover up the accident." Dunn intended the phrase "cover up the accident" in his text message to mean that Moore tried to clean the spill in an attempt to hide the spill, even though he admits that there is no documentation of Moore attempting to hide the spill, and even though Reed testified that Moore called him and told him he used the skid-steer to clean up the spill. (*See DRSIMF* ¶ 125, Doc. 44-2; Dunn Dep. 153–56, Doc. 35-23 at 86–89; *see also* Reed Dep. 111, 155 Doc. 35-4 at 51, 63 (testifying that Moore told him he would use the skid steer to clean up the spill).) And, as said earlier, Moore testified that, after the spill, Moore immediately called Reed, and Reed told Moore to clean it up. (Moore Dep. 59–61, Doc. 35-3 at 38–40.) All of these facts further show why summary judgment is inappropriate.

Additionally, Plaintiff shows discrepancies in Dunn's claim that Moore was not certified to operate the skid steer. To the contrary, Dunn also admitted that he is not aware of Moore's training certifications and that the statement in his text that Moore is not "trained to operate" a skid steer is based solely on what Moore was hired by Excel to do. (*DRSIMF* ¶ 126, Doc. 44-2.) In fact, Moore testified that he was certified to operate the skid steer. (Moore Dep. 23, Doc. 35-3 at 14.) Moore also submits evidence that he was certified by Excel to operate a Rubber Crawler at

Louisiana Pigment, which Addison testified was probably the same certification as a skid steer. (Doc. 35-31 (certification); Addison Dep. 17–18, Doc. 35-5 at 11–12.) Stephson likewise testified that the rubber crawler had the same type of steering mechanism as the skid steer. (Stephson Dep. 20–22, Doc. 35-27 at 11–13.) Again, these are questions of fact on whether Dunn's text was the real reason for the suspension or termination.

Third, Plaintiff attacks the text message's statement that "We have determined that you engaged in serious violations of Excel's procedures and safety guidelines," as (a) there are questions of fact about whether the violations were serious and (b) there are irregularities in the Excel's process in reaching that conclusion. On January 10, 2022, Mark Reed and then Excel Safety Manager Doug Stephson completed an investigation report, determining that the cause of the spill was "human error." Reed did not think that an indication of a "procedure violation" would have been accurate. (*DRSIMF* ¶ 109, Doc. 44-2.) The field for "corrective action" was left blank because Reed understood that Excel's higher-ups would make such decision. (*Id*. ¶ 110) After completing all other fields on the investigation report with Stephson on January 10, 2022, Reed had no involvement in the investigation and spoke with no one, other than Stephson, about the finding that the cause of the spill was "human error." (*Id*.) Project Manager Lout determined that there was no need for anything other than a "standard investigation" since the cause of the incident was "pretty straight forward." Lout could not imagine that there "would have been too much to do." (*Id.* ¶ 111.) According to Lout, "disciplinary leave," as opposed to standard leave, would not be required for Mr. Moore pending the investigation into the spill. (*Id.* ¶ 112.)

Thus, Plaintiff presents evidence that (1) serious discipline would not be needed for this relatively minor spill, and (2) though Excel claimed it needed more time for its executives to determine what corrective action was needed, the investigators had already determined the cause

of the incident. All of this strikes the Court has highly irregular, and a reasonable jury could reach the same conclusion.

Other irregularities exist with the investigation. Moore also testified that he was told by Reed to write his statement of what happened (i.e., that the zip tie on the valve came out because of bumps in the road). (Moore Dep. 53–54, Doc. 35-3 at 32–33.) Reed told Moore it was "highly impossible," even though it had happened several times with other drivers and Moore. (*Id.*) Moore finally said, "Well, okay. Maybe I forgot to close the valve," and Reed told him to write that down, which he did. (*Id.*) A reasonable jury could thus conclude that Moore was strong-armed into admitting to something he did not do, precisely because he filed suit.

Yet another irregularity lies with the shoddiness of the investigation. The report stated that Moore called Reed an hour after the incident after another employee advised him to do so, but Stephson said he did not speak with Moore about this; rather, Stephson got the information from John Deshotel (the other employee) and Reed. (Stephson Dep. 53–55, Doc. 35–27 at 24–26.) Stephson also didn't recall the basis for saying in the report that Moore was not certified; Reed talked to Moore about it, but Stephson said was "just speculation." (*id.* at 64, Doc. 35-27 at 29.) Likewise, his sole basis for writing that Moore operated the skid steer was Reed. (*Id.* at 65, Doc. 35-27 at 30.) Stephson also did not speak directly with the Louisiana Pigment Supervisor allegedly involved in the cleanup and did not have documentation for that finding. (*Id.* at 65–66, Doc. 35-27 at 30–31.) A reasonable jury could conclude that the investigation was so shoddy precisely because it was pretextual.

Further irregularities abound. VP Dunn called Moore and told him not to return to work until Moore heard back from him on January 11, 2022, eight days after Excel was served with Moore's lawsuit and one day after Stephson's report was completed. (*DRSIMF* ¶ 117, Doc. 44-2.)

On or around January 12, 2022, because he was not getting paid, Moore texted Mark Reed to ask if he could use vacation time to make up for time lost while he was out of work. (*Id.* ¶ 118.) Reed responded affirmatively. (*Id.*) In response to Mr. Moore's asking Reed for information as to how long he would have to wait before returning to work, Reed informed him that Moore would have to hear back from VP Dunn with approval to come back before returning to work at Excel. (*Id.*) Reed never discussed the investigation report with Lout or Dunn, nor did he hear from Excel management what the status of Moore's employment was, or what corrective action Excel planned to take. (*Id.* ¶ 119.)

It is critical here to note two things. For one, Dunn testified that no information was collected after a January 11, 2022, mechanics report was issued. (Dunn Dep. 145–46, Doc. 35-23 at 78–79.) Dunn didn't know whether anything had been documented concerning the investigation after this mechanics report, though he did say there remained statements to be taken. (*Id.* at 174–83, Doc. 35-23 at 107–116.) Stephson likewise testified that he did not recall any discussion of undetermined questions, undetermined causes, or potential causes of the incident in question after the January 11, 2022, mechanics report. (Stephson Dep. 83–84, Doc. 35-27 at 42–43.) Defendant disputes this and argues that the investigation continued, but this highlights questions of fact. The bottom line is that a reasonable jury could conclude from this lack of further investigation that the point of the suspension was not to inquire further into the causes of the incident but rather to punish Plaintiff for filing suit.

The second important point here is that, according to Dunn, he alone made the decision to suspend Moore without pay, after consulting with other management and General Counsel Cherie Pinac. (*DRSIMF* ¶ 132, Doc. 44-2.) Dunn does not recall when he made the decision, and the decision is not documented, despite Dunn's acknowledgment that disciplinary suspensions require

documentation, and despite Safety Manager Stephson's admission that the investigation report was never finalized. (*Id.*) Additionally, Dunn made this decision even though, typically, when an employee below a superintendent level needed to be hired or fired, such discipline would be handled by Mark Reed and Lout. (Lout Dep. 25–27, Doc. 35-9 at 6–8.) Normally, that process would not involve Shawn Dunn. (*Id.*) According to Lout, Dunn did not speak with him concerning the incident, the investigation, or Mr. Moore's employment status. (*DRSIMF* ¶ 135, Doc. 44-2.) Finally, at no point did Lout receive a communication concerning any request by Excel's client Louisiana Pigment to remove Mr. Moore from the job site. (*Id.* ¶ 114.) Although such a request must be documented, Lout is not aware of any documentation of any such request. (*Id.*) Thus, again, the irregularities involved in the procedure—including those concerning the lack of documentation, who made the decision, and the lack of consultation with those typically in charge of making the decision—provide further support for the conclusion that Moore's suspension or termination was pretextual.

Another substantial conflict of evidence involves Excel's alleged efforts to allow Moore to return to work. Dunn claims that he initiated a phone conversation with Chris Jennings of Louisiana Pigment to seek his approval to bring Mr. Moore back to the jobsite after the incident because the main issue regarding the incident, according to Dunn, was that Mr. Moore used the skid steer without obtaining authorization to do so. (*Id.*¶ 127.) Dunn does not recall when his conversation with Chris Jennings took place but claims that the conversation happened more than a week after the January 9, 2022, incident because of difficulty ascertaining who in Louisiana Pigment would have authority to approve of Moore's return. (*Id.* ¶ 128.) Dunn stated that he had only one conversation with Jennings, and that no one other than he and Jennings were parties to the conversation. (*Id.*) Dunn claims that Jennings gave his approval to have Mr. Moore return to

the jobsite, and that that was "the last thing [Excel] was waiting on to okay Mr. Moore to return to work," even though the investigation was complete by that point. (*Id.*) Dunn did not document this conversation and is otherwise unaware of any documentation of this conversation. (*Id* ¶ 129.)

Conversely, Chris Jennings, who oversees Neutralization and Utilities Operations of Louisiana Pigment, denies having any conversations with Shaun Dunn and does not know who Shaun Dunn is. (*Id.* ¶ 130.) He is unaware of Louisiana Pigment having any involvement in having Moore removed from the jobsite or in having Moore returned to the jobsite. (*Id.*) He is altogether unaware of any instance where Excel sought approval from Louisiana Pigment to return an Excel employee to the jobsite. (*Id.*) He recalls learning of Mr. Moore's separation from Excel through Mark Reed only recently and did not know that Mr. Moore had been removed from the jobsite. (*Id.*) Indeed, no one from Louisiana Pigment reached out to Dunn regarding Moore at any point, and Dunn is not aware of any documented concern of Louisiana Pigment concerning Moore. (*Id.*¶ 131.) The dramatic discrepancy between Dunn and Jennings' testimonies on this point cast further doubt on Dunn's proffered reasons for the suspension and termination.

Finally, the second text Dunn sent to Moore is further support for pretext. Specifically, on February 16, 2022, Mr. Moore received a nearly identical text to the one he received on February 11, 2022, from VP Dunn, except the new text contained corrected dates for the period of Mr. Moore's "suspension." (*DRSIMF* ¶ 134, Doc. 44-2.) The new text stated,

> We have completed our investigation into your conduct on 1/9/2022 when you failed to follow establish procedures and close the dump valve on the Ore trailer after unloading product at La. Pigment Silo. Your misconduct resulted in a substantial product spill. Instead of immediately reporting the accident, you used a Skid Steer loader in an attempt to clean and cover up the accident, although you are neither authorized nor trained to operate that piece of equipment. We have determined that you engaged in serious violations of Excel's procedures and safety guidelines. The Company had decided that you will be suspended without pay for three (3) weeks

> (1/19/2022 to 2/9/2022) and you will be issued a final written
> warning. Please advise immediately if you intend to return to work,
> but no later than Monday, February 21, 2022. If I do not hear from
> you by then, we will consider that you have voluntarily resigned
> your employment with Excel.

(*Id.*) The revision creates further irregularities in an already irregular process, and a reasonable jury could conclude that Excel was using this to support their backstory and to hide their retaliation.

In sum, when construing the evidence in a light most favorable to Plaintiff and drawing reasonable inferences in his favor, a reasonable jury could easily conclude that unlawful retaliation was the cause of Plaintiff's suspension or termination. A reasonable factfinder could also find from the above evidence (1) that Excel was "willing to deviate from established procedures in order to accomplish a discriminatory goal," *cf. Brown*, 2024 WL 1300286, at *5 n.26; (2) that there was a lack of documentation, and that this absence "matters" because there is a "basis upon which a jury could infer pretext," *Burton*, 798 F.3d at 240; and (3) that this significant evidence coincided with highly suspicious timing between the protected activity of filing suit and the adverse action. Finally, all of the evidence highlighted above (particularly Defendant's silence during the alleged suspension) demonstrates questions of material fact on whether the Plaintiff was suspended or terminated. Consequently, Defendant's motion for summary judgment on this issue will be denied.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment* (Doc. 26) by Defendant Excel Contractors, LLC, is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** in that all claims of retaliation, except for those arising from Moore's filing of the instant lawsuit, are **DISMISSED WITH PREJUDICE**. In all other respects—and in particular with respect to

Plaintiff's harassment claim and his claim he was retaliated against by being suspended or terminated—the motion is **DENIED**.

Signed in Baton Rouge, Louisiana, on June 3, 2024.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**